**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JON VANAMRINGE, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) **CIVIL ACTION NO. 06cv0822** ) ) |
| vs. | ) ) |
| ROYAL GROUP TECHNOLOGIES, LIMITED, DOUGLAS DUNSMUIR, GARY BROWN, VIC DE ZEN, AND RON GOEGAN, | ) CLASS ACTION COMPLAINT ) ) ) |
| Defendants. | ) **JURY TRIAL DEMANDED** ) ) |

Plaintiff, Jon VanAmringe, ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding by Royal Group Technologies, Ltd. ("Royal Group" or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

**NATURE OF THE ACTION**

1.      This is a federal class action on behalf of on behalf (i) all United States citizens and entities that purchased or otherwise acquired the common stock of Royal Group on the New York Stock Exchange ("NYSE") or the Toronto Stock Exchange ("TSE"); and (ii) all foreign persons and entities that purchased or otherwise acquired the common stock of Royal Group on the NYSE, between February 24, 2000 and October 18, 2004, inclusive (the "Class Period"), alleging violations

-1-

of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and the rules and regulations promulgated thereunder.

2.      Royal Group is a vertically integrated manufacturer of polymer-based home improvement, consumer and construction products.

3.      The Complaint alleges that prior to and during the Class Period, defendant Vic De Zen and other defendants concealed the existence of these related party transactions, thereby concealing highly material facts from Royal Group investors.  More specifically, the Defendants failed to disclose the following materially adverse facts to the market: (1) that Individual Defendants abused their control over the Company to engage in a series of undisclosed related-party transactions and self-dealing transactions, which were never disclosed to shareholders; (2) as a result of this abuse of power, the Individual Defendants reaped substantial personal gains from their dealings; (3) that the undisclosed self-dealing and related-party transactions, caused the Company to misappropriate millions of dollars; (4) that the Company lacked adequate controls in place to ensure that related-party transactions were disclosed to the Company's shareholders; and (5) that the Company's financial results were not prepared in accordance with Canadian Generally Accepted Accounting Principles ("Canadian GAAP") or reconciled with US Generally Accepted Accounting Principles ("US GAAP").

4.      On February 25, 2004, Royal Group revealed that it was the subject of an investigation by the Ontario Securities Commission (the "OSC") into the flow of goods and services between the Company and a resort owned by De Zen.  In response to this announcement, Royal Group purportedly organized a so-called Special Committee to conduct an "independent" inquiry

into the conduct that the OSC was investigating.  The Special Committee quickly concluded that there was no evidence of wrongdoing.

5.      On October 15, 2004, the Company announced that the Company insiders were the subject of the Royal Canadian Mounted Police's ("RCMP") criminal investigation in connection with their engaging in self-dealing transactions with Royal Group. Then, on October 18, 2004 (after the close of trading), the Company announced that the Company itself, as well as the Company insiders, were being criminally investigated by the RCMP in connection with the defendants' self-dealing transactions.  As a result of the revelations of the substantial self-dealing transactions by Defendants, shares of Royal Group fell $1.12 per share, or 12.49 percent, on October 18, 2004 (the first day of trading after the disclosure of the RCMP's investigation into the Company), to close at $7.85 per share.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

8.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Pursuant to 28 U.S.C. §1391(d), as an alien corporation, Canadian Superior may properly be sued in any District in the United States, including the Southern District of New York.  Moreover, Royal securities trade on the New York Stock Exchange, which is located in the Southern District of New York.  Thus, venue is proper in this District.

9.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

10.     Plaintiff, Jon VanAmringe, bought shares of Royal Group during the Class Period and has suffered damages as a result of the wrongful acts of defendants as alleged herein.

11.     Defendant Royal Group is a Canadian corporation with its principal offices located at 1 Royal Gate Boulevard, Woodbridge, Ontario L4L 8Z7.

12.     Defendant Vic De Zen ("De Zen") was, at all relevant times, the Company's Chairman of the Board of Directors.  Defendant De Zen also served as the Company's Chief Executive Officer from 1994 until December 18, 2003.

13.     Defendant Douglas Dunsmuir ("Dunsmuir") was, at all relevant times, the Company's director.  Defendant Dunsmuir became President of Royal Group in March 2002, Co-Chief Executive Officer in September 2003, and Chief Executive Officer in December 2003.

14.     Defendant Gary Brown ("Brown") was, from 1994 until December 2001, the Company's Executive Vice President and Chief Financial Officer

15.     Defendant Ron Goegan ("Goegan") was, from December 1, 2001 until November 2004, the Company's Senior Vice President and Chief Financial Officer.

16.     Defendants Dunsmuir, Brown, De Zen and Goegan are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Royal Group's

quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

17.    Royal Group is a vertically integrated manufacturer of polymer-based home improvement, consumer and construction products. Royal's operations are located primarily in Canada and the United States, with international locations in Mexico, South America, Europe and Asia. The Company's operations are arranged into two segments, Products and Support. The Products segment consists of 58 wholly owned or joint ventured business units engaged in the manufacture of the following product lines: home improvement products, consumer products and construction products. The Support segment consists of 17 wholly or joint ventured business units. It is tasked with a series of activities primarily supplied to the Products segment to facilitate customer service, rapid product development and a low cost structure.

**Related-Party Transactions**

18.     Prior to and throughout the Class Period, defendant De Zen and the other Individual Defendants engaged in a series of related-party transactions with Royal Group.  These transactions were not disclosed to Royal Group shareholders during the Class Period.  The following is a summary of the inappropriate related-party transactions:

**The Vaughan West Lands Transaction**

19.     A company owned by defendant De Zen and several of the Individual Defendants purchased the "Vaughan West Lands," a plot of land in Woodbridge, Ontario, in 1998 for approximately $20.9 million.  Immediately after the closing of this land transaction, De Zen caused Royal Group to purchase the Vaughan West Lands by purchasing the company for $27.4 million, thereby immediately reaping $6.5 million in gains at the expense of Royal Group.  Royal Group has now admitted that " the land was owned by officers and directors of the Company was not disclosed. And what was not authorized was a related-party transaction to acquire the land."

**The Masonite Warrant Exercise**

20.     In early 2000, the Company received a warrant for 200,000 shares of another public company, Premdor Inc., now known as Masonite International Corporation ("Masonite") as partial consideration for the sale of a subsidiary to Masonite.  In 2002, five senior Royal Group executives and one employee used their control over the Company and exercised the warrant, resulting in a gain of about $1.7 million.  The employees deposited a total of $2.65 million with the Company, which funded the Company's payment to Masonite to exercise the warrant.  The shares obtained were then distributed by the Company to the six individuals. The warrant and the transfer of the shares to the individuals were not recorded in the accounting records of the Company.

-6-

**The Resort Transactions**

21.     The Individual Defendants owned and controlled an entity known as Royal St. Kitts Beach Resort Limited (the "Resort").  From 1998 until at least 2002, Individual Defendants caused the Company to engage in secretive and undisclosed transactions with the Resort  which included selling the Resort more than $32 million in products and services.

**Defendant De Zen Used Company Assets, Benefits,
and Facilities for His Personal Use**

22.     Between 1998 and 2003, De Zen caused the Company to facilitate foreign currency exchange transactions at exchange rates available to the Company, and utilized Company bank accounts to transfer funds internationally on behalf of De Zen, a significant shareholder, and certain Company executives in the amount of $95,000,000.  Between 1997 and 2002, the Company managed the construction of four real estate developments for De Zen and his family members. The Company paid invoices associated with these projects aggregating $21,100,000.

**From 1998 to 2002, the Company Sold De Zen and His
Family Members Assets, Parts and Services Worth More than $830,000**

23.     During 2000 and 2002, in undisclosed related-party transactions, the Company sold assets for $240,000 and $300,000 respectively, to companies controlled by defendant De Zen.  From 1998 to 2002, in undisclosed related-party transactions, the Company sold parts and services to defendant De Zen's family members for $290,000.

**Between 1994 and 2000, Defendants Caused the Company
to Engage in More than $7.3 Million-Worth of Undisclosed
Related-Party Real Estate Transactions**

24.     Between 1994 and 2000, defendants caused the Company to engage in more than $7.3 million worth of undisclosed related-party real estate transactions. In 1997, the Company

purchased two parcels of real estate from a company related to a director for $2,550,000.  In 1998,

the Company purchased two parcels of real estate from Defendant De Zen for $2,900,000.  Between

1994 and 2000, the Company sold to Defendant De Zen over $1.3 million in real estate.  In 2003,

the Company sold real estate to Defendant De Zen's family members, certain employees and a

former employee for $350,000.  In 1995 and 1997, the Company sold real estate to a significant

shareholder for $110,000 and $80,000, respectively.  Additionally, between 1999 and 2001, the

Company entered into nine joint land service agreements with companies related to defendant De

Zen and a director of the Company.

### Materially False And Misleading
### Statements Issued During The Class Period

25.    On February 24, 2000, Royal Group filed a Form 6-K with the SEC, including its

Annual Report for the fiscal year ended September 30, 1999 (the "1999 6-K").  The 1999 6-K

contained the Company's financial results for its fiscal 1999 fourth quarter and year end, ended

September 30, 1999.  Fiscal 1999 sales totaled $1.28 billion, up 22% from $1.05 billion in 1998.

EBITDA margins as a percentage of sales were 25.7%, up from 23.9% in 1998.  Net earnings for

the full fiscal year were $150 million, up 29% from $116 million in the previous year.

26.    Furthermore, the 1999 6-K contained the following discussion of the Company's

senior executives:

> Royal has been able to develop a strong management team by
> attracting people with a broad range of skills, training and
> experience...
>
> The following are brief biographies of the senior executive
> management team:
>
> Vic De Zen, acts as Chairman of the Board, President and Chief
> Executive Officer. He has driven Royal since its inception in 1970.

> Royal has grown to become North America's largest extruder of PVC building products through the vision and leadership of Mr. De Zen. Originally a tool and die maker by trade, Mr. De Zen is a recognized leader in his field . . . . He sets the strategic direction of the company with his senior managers and is involved in all major matters affecting Royal.

***

> Gary Brown, has served as Executive Vice President and Chief Financial Officer since joining Royal in 1985...His primary responsibilities include the negotiation and ongoing financing of most major transactions in Royal, as well as the direction of the accounting, tax and information systems administered by his staff.

> Douglas Dunsmuir, serves as Executive Vice President and General Counsel.   His primary responsibilities include the negotiation and related legal work of most major transactions of Royal, including joint venture and other contract preparation, intellectual property issues, litigation support and corporate compliance.

27.    On February 9, 2001, Royal Group filed a Form 6-K with the SEC, including its Annual Report for the fiscal year ended September 30, 2000 (the "2000 6-K").  The 2000 6-K contained the Company's financial results for the fourth quarter of fiscal 2000, ended September 30, 2000.  Furthermore, the 1999 6-K contained the following discussion of the Company's senior executives:

> Royal has been able to develop a strong management team by attracting people with a broad range of skills, training and experience...

> The following are brief biographies of the senior executive management team:

> Vic De Zen, acts as Chairman of the Board, President and Chief Executive Officer. He has driven Royal since its inception in 1970. Royal has grown to become North America's largest extruder of PVC building products through the vision and leadership of Mr. De Zen. Originally a tool and die maker by trade, Mr. De Zen is a recognized leader in his field . . . . He sets the strategic direction of the company

-9-

with his senior managers and is involved in all major matters
affecting Royal.

***

Gary Brown, has served as Executive Vice President and Chief
Financial Officer since joining Royal in 1985...His primary
responsibilities include the negotiation and ongoing financing of most
major transactions in Royal, as well as the direction of the
accounting, tax and information systems administered by his staff.

Douglas Dunsmuir, serves as Executive Vice President and General
Counsel.  His primary responsibilities include the negotiation and
related legal work of most major transactions of Royal, including
joint venture and other contract preparation, intellectual property
issues, litigation support and corporate compliance.

28.     On November 19, 2001, Royal Group announced financial results for the fourth

quarter of fiscal 2001, ended September 30, 2001.  Net sales for the quarter were $474 million, up

9% from $435 million recorded during the same period in 2000.  Net earnings were $50 million, or

$0.54 per share fully diluted, compared to $53 million or $0.58 per share reported last year.  Sales

growth continued to be broadly based across all product lines in the Products Segment, with the

exception of Royal Building Systems and Window Coverings.  Double-digit sales growth was

generated by Patio Furniture and Indoor Storage Products, Pipe and Fittings and Siding, which were

up by 66%, 17% and 14% respectively.  Royal generated 60% of its sales in the United States, 29%

in Canada and 11% internationally.  During the quarter, EBITDA margins were $96 million, versus

$107 million last year.  The Products Segment generated EBITDA of $44 million, while the Support

Segment generated $52 million.  As a percentage of sales, EBITDA margins were 20.3%, versus

24.6% last year.  Commenting on these results, defendant De Zen stated:

margins were constrained by manufacturing inefficiencies resulting
from a combination of disruptions to operations in the wake of

September 11th, inventory reduction programs and slowdowns in certain international markets.

29.     Reflecting on the full fiscal year, Defendant De Zen stated the following:

capital expenditures were reduced to $208 million from $374 million last year[.]...He noted that Royal achieved sales growth during the year with approximately the same number of employees as the previous year, evidencing the new complex's ability to enhance manufacturing efficiencies going forward[.]...as a result of successful execution of strategies to increase market share and introduce new products[.]...operating cash flow in excess of capital expenditures, in spite of the difficult economic environment and completion of the expansion program.

30.     Commenting on the outlook for 2002, Mr. De Zen noted the following:

further reductions in capital expenditures together with sales of non-strategic assets position Royal for increasing free cash flow, debt reduction and improving returns[]...Management is comfortable with the range of Analysts' earnings expectations for 2002.

31.     On January 15, 2002, Royal Group filed a Form 6-K with the SEC including its Annual Report for the fiscal year ended September 30, 2001 (the "2001 6-K").  The 2001 6-K contained the Company's previously announced financial results.  Also, the 2001 6-K contained the Company's Proxy Statement for the Annual Meeting of Shareholders dated February 20, 2002 ("2002" Proxy Statement), which in relevant part stated:

CORPORATE GOVERNANCE PRACTICES

Royal Group's current corporate governance practices are based on the principles of fairness, accountability, transparency and responsible corporate behavior and reflect fairly the interests of public shareholders, the substantial management and employee investment in Royal Group and Royal Group's historic and current entrepreneurial and growth-oriented nature. Royal Group's corporate governance practices are described below with reference to the corporate governance guidelines of The Toronto Stock Exchange which were published to help corporations assess their corporate governance practices (collectively, the "Guidelines").

***

## MANDATE OF THE BOARD

The Board of Directors' mandate is to supervise the management of the business and affairs of Royal Group and to act with a view to the best interests of Royal Group. The Board fulfills its mandate directly and through its Audit Committee. At regularly scheduled meetings the Directors receive and discuss reports on Royal Group's financial position and operating performance. The Board of Directors also discharges its responsibilities as follows:

    i)   it reviews the strategic planning and business objectives which are submitted by Management and discusses with the Chief Executive Officer and senior management the strategic plan and objectives that should be pursued by Royal Group;

    ii)  it is informed on a periodic basis of the principal risks faced by Royal Group and the steps implemented to manage these risks by periodic management reports. The Audit Committee monitors these risks and Royal Group's internal controls and management information systems and reports directly to the Board on a regular basis;

    iii) it is responsible for assessing the performance of Royal Group's executive officers based on the recommendations of the Chief Executive Officer and for succession planning in respect of senior management.

***

## BOARD COMPOSITION

The Board is composed of nine Directors, five of whom are "inside" management Directors, including Vic De Zen, Royal Group's controlling shareholder, and four of whom are "outside" Directors who are "unrelated" to Royal Group and to its significant shareholder within the meaning of the Guidelines. An "unrelated" director under the Guidelines is a Director who is
free from any interest and any business or other relationship which could, or could reasonably be perceived to materially interfere with the Director's ability to act in the best interests of the Corporation, other than interests and relationships arising from the Director's shareholdings.  The Board considers that the five "inside" Directors

are able to, and do act, with a view to the best interests of Royal Group, with their compensation as officers of Royal Group being tied to a consistent measurement of corporate performance, and are sensitive to avoidance and disclosure of conflicts of interest. The Board believes that the presence of its senior executives on the Board is a key factor in Royal Group's success. These Directors bring to the Board the knowledge and experience that they have acquired during their long length of service with Royal Group. The insight that each offers in his particular area of responsibility has been instrumental in creating an effective Board and in achieving Royal Group's successful results.

\*\*\*

INTEREST OF INSIDERS IN MATERIAL TRANSACTIONS

During the year ended September 30, 2001, no Director, senior officer, principal shareholder or other insider of Royal Group, nor any associate or affiliate thereof, has or has had any material interest, direct or indirect, in any transaction or in any proposed transaction which has materially affected or would materially affect Royal Group, its affiliates or any of their collective subsidiaries.

32.    On March 7, 2002, the Company issued a press release entitled "Royal Group Appoints Douglas Dunsmuir President."  The press release, in part, stated:

Royal Group Technologies Limited (RYG: TSE, NYSE) announced today that Douglas Dunsmuir has been appointed as President. Mr. Dunsmuir will continue to report to Vic De Zen, Chairman and C.E.O. Mr. De Zen previously filled the President's role.

\*\*\*

Vic De Zen commented on the appointment of Mr. Dunsmuir to the position of President saying, "Royal currently has many opportunities for profitable growth, which will be seized more rapidly with Doug filling the day to day management role." He added that Royal could not have a better person for the job, noting that "Doug knows the company well, is hard-working and well respected by the entire Royal team."

\*\*\*

Mr. Dunsmuir commented on his new position saying, "Royal has a strong group of operational managers, who will now have an additional executive to help them fully realize the potential before their businesses."

33.     On November 19, 2002, Royal Group announced financial results for the fourth quarter of fiscal 2002, ended September 30, 2002.  Net sales for the quarter were $547 million, up 15% from $474 million recorded during the same period in fiscal 2001.  Organic sales growth during the quarter was 5%, with the remaining growth attributable to the acquisition of Marley Mouldings. Net earnings were $38.3 million or $0.41 per share fully diluted, prior to recording a non-cash charge for capital assets of $23.5 million before tax or $0.18 per share after tax.  Including the charge, Royal's net earnings for the quarter were $21.7 million, or $0.23 per share fully diluted. In fiscal 2001, Royal reported fourth quarter earnings of $50.0 million or $0.54 per share fully diluted. Royal adopted Section 3062 of the CICA Handbook in fiscal 2002 and no longer amortizes goodwill, which represented approximately $1.5 million or $0.015 per share during the fourth quarter of fiscal 2001.  All product lines, with the exception of Window Coverings, generated sales growth during the fourth quarter.  Sales of Home Improvement Products were up by 42%, with organic growth being 16%.  Consumer Products sales increased 5%, with sales growth restrained by a decline in window covering sales. Construction Product sales increased 4% and Royal Building Systems and Foreign Operations sales increased by 5%. Royal generated 62% of its sales in the United States, 29% in Canada and 9% internationally.  EBITDA margins were $100 million prior to the charge for capital assets, versus $96 million recorded in the same quarter last year.  The Products Segment generated EBITDA of $64 million, while the Support Segment generated $36 million. Excluding the charge, EBITDA margins were 18.3% as a percentage of sales, versus 20.3% last year.  The charge had been recorded pursuant to an on-going review of capital assets, initiated

-14-

in the fall of 2001. The charge primarily related to the writeoff of first generation recycling equipment and tooling, which had been recently replaced by second generation technology, enabling entry into more efficient commercial production of roof tiles, window and door components and decking.  The charge also included certain equipment previously used in production of window coverings.

34.     On January 10, 2003, Royal Group filed a Form 6-K with the SEC, including its annual report for the fiscal year ended September 30, 2002 (the "2002 6-K").  The 2002 6-K contained the Company's previously announced financial statements.  The Company's 2002 6-K, under the heading "Related Party Transactions", stated that "[d]uring the year, the Company disposed of a corporate airplane and certain non-strategic land parcels to shareholders for aggregate net cash proceeds of $22,800, which was fair market value."  Also, the 2002 6-K, under the heading "Our System of Corporate Governance," stated that  "Ensuring sound business practices is a critical element of our accountability to our stakeholders. Royal Group continues to implement a series of checks and balances to further ensure good corporate governance."

35.     Moreover, the 2002 6-K contained the Company's Proxy Statement for the Annual Meeting of Shareholders dated February 20, 2003 ("2003" Proxy Statement), which, in relevant part, stated:

> STATEMENT OF CORPORATE GOVERNANCE PRACTICES
>
> Royal Group's corporate governance practices are based on the principles of fairness, accountability, transparency and responsible corporate behaviour and are intended to reflect fairly the interests of public shareholders, the substantial  management and employee investment in Royal Group and Royal Group's historic and current entrepreneurial and growth-oriented nature. Royal Group's corporate governance  practices are described below with reference to the 14

corporate governance  guidelines of The Toronto Stock Exchange (the "Guidelines").

\*\*\*

## 1.  Mandate of the Board

The Board of Directors' mandate, which mandate meets the requirements of the Guidelines, is to supervise the management of the business and affairs of Royal Group and to act with a view to the best interests of Royal Group. The Board fulfills its mandate directly and through its Audit Committee.

## 2. BOARD COMPOSITION

The Board is currently composed of nine Directors, five of whom are "inside" and "related" management Directors,including Vic De Zen, Royal Group's controlling shareholder,and four of whom are "outside" Directors who are "unrelated" to Royal Group and to its significant shareholder within the meaning of the Guidelines. The four "unrelated" Directors are Ralph Brehn, Irvine Hollis, Ronald Slaght and Gregory Sorbara. The five "related" Directors are Vic De Zen, Douglas Dunsmuir, Gwain Cornish, Ron Goegan and Mario Cadorette. Mario Cadorette will not be nominated as a Director at the Annual Meeting of Shareholders on February 20, 2003. The "unrelated" Directors may meet without management or "related" Directors present. Although having a majority of related Directors is not in accordance with the Guidelines, the Board considers that the "related" Directors are able to, and do act, with a view to the best interests of Royal Group, with their compensation as officers of Royal Group being in part tied to corporate performance, and each such Director is sensitive to the avoidance and disclosure of conflicts of interest. The Board believes that the presence of its senior executives on the Board is a key factor in Royal Group's success. These management Directors bring to the Board the knowledge and experience that they have acquired during their long length of service with Royal Group. The insight that each offers in his particular area of responsibility has been instrumental in creating an effective Board and in achieving Royal Group's long term success. Having a majority of "related" Directors is not in accordance with the Guidelines.

\*\*\*

-16-

INTEREST OF INSIDERS IN MATERIAL TRANSACTIONS

> During the year ended September 30, 2002, Royal Group disposed of a corporate airplane and certain non-strategic land parcels for aggregate net cash proceeds of $22,800,000,which was fair market value,to corporations affiliated with Vic De Zen (business address:1 Royal Gate Boulevard,Vaughan,Ontario) and Domenic D'Amico (business address: 1 Royal Gate Boulevard, Vaughan, Ontario), each of whom is an insider, principal shareholder and employee of Royal Group.

> Except for such transactions, no Director, senior officer, principal shareholder or other insider of Royal Group, nor any associate or affiliate thereof, has or has had any material interest, direct or indirect, in any transaction or in any proposed transaction which has materially affected or would materially affect Royal Group, its affiliates or any of their collective subsidiaries.

36.     On February 12, 2003, the Company issued a press release entitled "Royal Group Announces Formation Of Two Board Committees."  The press release, in relevant part, stated:

> Royal Group Technologies Limited (NYSE:RYG) (TSX:RYG) announced today that the Board of Directors has established a Compensation Committee, as well as a Nomination and Corporate Governance Committee. Both committees are comprised of a majority of Independent Directors and are expected to commence their respective duties as soon as practicable. Vic De Zen commented on the committees saying, "the entire Board of Directors is committed to continuous enhancement of corporate governance."

37.     On February 14, 2003, Royal Group filed its annual report with the SEC on Form 40 -F, for the fiscal year ended September 30, 2002.  The Company's Form 40-F included the following discussion of the Company's controls and procedures:

CONTROLS AND PROCEDURES

> Royal's principal executive officer and its principal financial officer, after evaluating the effectiveness of Royal's disclosure controls and procedures (as defined in Exchange Act Rules 13a-14(c) and 15d-14(c)) on February 13, 2003, have concluded that, as of such date, Royal's disclosure controls and procedures were adequate and

effective to ensure that material information relating to Royal and its consolidated subsidiaries would be made known to them by others within those entities.

There were no significant changes in Royal's internal controls or in other factors that could significantly affect Royal's disclosure controls and procedures subsequent to the date of their evaluation, nor were there any significant deficiencies or material weaknesses in Royal's internal controls. As a result, no corrective actions were required or undertaken.

38.    Additionally, the Company's Form 40-F included the following Sarbanes-Oxley required certifications signed by defendant De Zen and Goegan:

1.  I have reviewed this annual report on Form 40-F of Royal Group Technologies Limited;

2.  Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

(a)  Designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

(b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

-18-

(c) Presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.   The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (and persons performing the equivalent function):

(a)  All significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.   The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or any other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

39.   On November 19, 2003, Royal Group announced financial results for the fourth quarter of fiscal 2003, ended September 30, 2003.  Net sales for the quarter were $527 million, compared with $547 million recorded during the same period in fiscal 2002.  During the quarter, Royal Group recorded in its results $116 million in pretax charges, and accordingly was reporting a net loss of $78 million or $0.84 per share on a diluted basis, compared to net earnings of $22 million or $0.24 per share on a diluted basis.  The change in sales from the previous year could be attributed to the US dollar denominated sales in 2003 being recorded at a lesser exchange rate, although sales of Housewares & Furniture and from RBS & Foreign Operations decreased year over year.  Assuming the same average exchange rate for the quarter as the same quarter in last fiscal

year, sales in Canadian dollar equivalency would have been approximately $572 million, up approximately 5% from last year.  Royal generated 58% of its reported dollar sales in the United States compared with 62% last year, 35 per cent in Canada compared with 29% last year, and 7% internationally, compared with 9% last year.  Had the sales been converted using the same average exchange rate as last fiscal year, the current year percentages would have been 60%, 32% and 8%, reflecting essentially no shifting in geographical sales dispersion from last year.  A pretax charge of $116 million was recorded during the fourth quarter, relating to charges for RBS & Foreign Operations, and other assets, as commented upon in a separate press release issued this date. Including the charges noted above, EBITDA for the fourth quarter was ($43.4) million.  EBITDA would have been $72.6 million without the above noted charges, compared with $99.9 million recorded last year prior to a capital asset charge.  During the fourth quarter of fiscal 2003, the Products Segment reported EBITDA of ($41.8) million, including charges of $87.7 million, while the Support Segment reported ($1.6) million, including charges of $28.3 million.  EBITDA margins were (8.2)% as a percentage of sales, but were 13.7% excluding the above noted charges compared with 18.3% last year, excluding last year's capital asset charge.  Royal noted that there were significant plant slowdowns, and in some cases, temporary plant shutdowns, which had been planned for, and followed through on, during the fourth quarter, aimed at reducing inventory levels throughout the group. The resulting production inefficiencies negatively impacted Royal's EBITDA margins during the quarter.  Additionally, foreign exchange differential in the CAD/USD also impacted the quarter's results.  Royal's capital expenditures during the fourth quarter were $22 million bringing the fiscal year total to $94 million, as compared with $133-million last year. Commenting on these results, defendant Dunsmuir stated:

-20-

> [O]ur EBITDA for our Window Coverings Division was positive for the month of September, as forecasted, and certainly a significant improvement from recent experiences. We continue to focus on various capacity utilization issues and cost curtailment measures across the Group, as well as our transition to increasing sales and marketing activities. The financial impact of these strategic initiatives are not expected to be fully realized until the latter half of fiscal 2004, but progress is tangible and is gaining momentum.

40. On February 5, 2004, Royal Group filed a Form 6-K with the SEC, including its annual report for the fiscal year ended September 30, 2003 (the "2003 6-K"). The 2003 6-K contained the Company's previously announced financial statements. The Company's 2003 6-K, under the heading "Related Party Transactions", stated that "During 2003, the Company sold products to companies related to shareholders totaling $1,650 (2002 - $22,800), which was at fair market value." Also, the 2003 6-K, under the heading "Enhancing Corporate Governance," stated that "Since reporting to you last year, we have worked diligently to enhance Royal Group's corporate governance.   In addition to the enhancements to the Board, we adopted a formal Code of Ethics applying to principal executive officers and senior financial officers."

41. Moreover, the 2003 6-K contained the Company's Proxy Statement for the Annual Meeting of Shareholders dated February 25, 2004 ("2004" Proxy Statement), which in relevant part stated:

STATEMENT OF CORPORATE GOVERNANCE PRACTICES

The Corporation's Board of Directors and management support the Guidelines for Corporate Governance (the "Guidelines") adopted by the Toronto Stock Exchange ("TSX") in 1995. Royal Group's current corporate governance practices are in accordance with 10 of the 14 Guidelines and Royal Group intends to increase the number of its practices that are fully in accordance with the Guidelines by the end of 2004.

\*\*\*

-21-

INTEREST OF INSIDERS IN MATERIAL TRANSACTIONS

No Director, senior officer, principal shareholder or other insider of Royal Group, nor any associate or affiliate thereof, has or has had any material interest, direct or indirect, in any transaction or in any proposed transaction which has materially affected or would materially affect Royal Group, its affiliates or any of their collective subsidiaries.

***

APPENDIX E

CORPORATE GOVERNANCE REPORT

Below Royal Group's governance procedures are compared with t he TSX corporate governance disclosure guidelines.

***

The Board of Directors' mandate is to supervise the management of the business and affairs of Royal Group and to act with a view to the best interests of Royal Group. The Board fulfils its mandate d irectly and through its Committees. The Board seeks to ensure that Royal Group is managed so as to enhance shareholder value and to ensure its long-term viability.

***

Royal Group has adopted a Disclosure Policy which reflects its commitment to provide timely and accurate corporate information to investors, shareholders and the general public.

***

The Audit Committee is responsible for the oversight of the reliability and integrity of accounting principles and practices, financial statements and other financial reporting, and disclosure practices followed by management. The Audit Committee has oversight responsibility for the establishment by management of an adequate system of internal controls and the maintenance of practices and processes to assure compliance with applicable laws.

-22-

42.     On February 18, 2004, Royal Group filed its annual report with the SEC on Form 40-F, for the fiscal year ended September 30, 2003.  The Company's Form 40-F included the following discussion of the Company's controls and procedures:

DISCLOSURE CONTROLS AND PROCEDURES

A       EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES

The Registrant maintains disclosure controls and procedures and internal control over financial reporting designed to ensure that information required to be disclosed in the Registrant's filings under the Securities Exchange Act of 1934, as amended (the "Exchange Act") is recorded, processed, summarized and reported within the time period specified in the rules and forms of the SEC. The Registrant's Chief Executive Officer and Chief Financial Officer, after having evaluated the effectiveness of the Registrant's disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of the end of the period covered by this report have concluded that, as of such date, the Registrant's disclosure controls and procedures were adequate and effective to ensure that material information relating to the Registrant and its consolidated subsidiaries would be made known to them by others within those entities.

B.      CHANGE IN INTERNAL CONTROL OVER FINANCIAL REPORTING

There was no change in the Registrant's internal control over financial reporting that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, its internal control over financial reporting.

CODE OF ETHICS

The Registrant has adopted a Code of Business Conduct and Ethics (included as Exhibit 6 to this report) that applies to all directors, officers and employees of the Registrant.

43.     On February 25, 2004, the Company issued a press release entitled "Royal Group Technologies Limited."  Therein, the Company, in relevant part, stated:

Royal Group Technologies Limited ("Royal Group" or the "Company") (RYG: TSX, NYSE) announced today that the Enforcement Branch of the Ontario Securities Commission ("OSC") informed the Company yesterday afternoon after the close of the markets that, based on the OSC's investigation relating to the Company, including information recently obtained by the OSC, public disclosure should be made of the existence of the investigation. The Company understands that the investigation principally concerns transactions between the Company and a St. Kitts resort development which was a purchaser of the Company's products and services. The St. Kitts resort, which is controlled by Mr. Vic De Zen, the controlling shareholder of the Company, purchased goods and services from the Company over the past five years which the Company advises have a value of approximately $32 million. The OSC also informed the Company this morning that the RCMP, along with the Canada Customs Revenue Agency, is conducting its own investigation.

44.    On March 16, 2004, defendant De Zen issued a press release entitled "Personal Statement from Mr. Vic De Zen." The press release, in part, stated:

Media coverage surrounding Royal Group Technologies Limited and The Royal St. Kitts Beach Resort has prompted me to issue this statement.

I am the founder, current Chairman and major shareholder of Royal Group, and one of several owners in the Resort. I am proud of Royal Group and the Resort and have always conducted my business affairs in a straightforward manner and with the highest standards consistent with the best interests of both organizations.

When I learned of the OSC's inquiry at the end of last year, I fully endorsed the decision of Royal Group's Board to set up a Special Committee of independent board members to look into the general matters raised by the OSC, as well as the Special Committee's decision to retain independent counsel and the forensic accounting firm of Kroll Lindquist Avey to review the books and records of both Royal Group and the Resort.

***

The Resort and my interest in it are well known. All business transactions between Royal Group and the Resort have been done on

-24-

appropriate commercial terms and are fully recorded in the books of
Roya l Group and the Resort.

45.     On April 29, 2004, the Company issued a press release entitled "Royal Group:

Forensic Auditors and Special Committee Complete Investigation And Recommend No Further

Investigative Actions To Be Taken At This Time."  Therein, the Company, in relevant part, stated:

> Royal Group Technologies Limited ("Royal Group" or the
> "Company") (NYSE:RYG) (TSX:RYG) announced today that the
> special committee of its board of directors (the "Special Committee")
> has reported to the board of directors of the Company on the
> completion of the investigation conducted by Kroll Lindquist Avey
> ("Kroll"). Kroll are the independent forensic auditors retained by the
> Special Committee to investigate transactions between the Company
> and the Royal St. Kitts beach resort development (referred to as the
> "St. Kitts Project"), which is majority owned by Vic De Zen, the
> Company's controlling shareholder and chairman.
>
> ***
>
> Recommendations of the Special Committee
>
> The Special Committee and its counsel have examined all the
> instances id entified by Kroll where management of the Company
> exercised business judgment on transactions with the St. Kitts
> Project. On balance, the Special Committee has determined that these
> judgments were reasonable in all of the circumstances and it does not
> recommend that any action be taken by the Company with respect to
> them. In reaching its recommendation in this regard, the Special
> Committee took into account the overall conclusion reached by Kroll
> that it found no evidence of conduct calculated to shift costs
> inappropriately to the Company. The Special Committee also noted
> that the St. Kitts Project generated approximately $33 million in
> revenue for the Company and its subsidiaries with an overall positive
> financial contribution to the Company.
>
> Based on all of the available information, including, in particular, the
> results of the Kroll investigation, the Special Committee has
> recommended that no further investigative action be taken at this
> time.

-25-

46.     The statements referenced above in ¶¶ 25-45 were each materially false and misleading because they failed to disclose and/or misrepresented the following adverse facts, among others: (1) that Individual Defendants abused their control over the Company to engage in a series of undisclosed related-party transactions and self-dealing transactions, which were never disclosed to shareholders; (2) as a result of this abuse of power, the Individual Defendants reaped substantial personal gains from their dealings; (3) that the undisclosed self-dealing and related-party transactions, caused the Company to misappropriate millions of dollars; (4) that the Company lacked adequate controls in place to ensure that related-party transactions were disclosed to the Company's shareholders; and (5) that the Company's financial results were not prepared in accordance with Canadian GAAP or reconciled with US GAAP.

## The Truth Begins to Emerge

47.     On October 15, 2004, Royal Group announced that Staff of the Ontario Securities Commission (the "Commission") provided the Company with a copy of a Production Order  (the "Order") on October 12, 2004 that was issued on October 5, 2004 by a Justice in Ontario addressed to the Vice President and Chief Security Officer of Scotiabank.  The Company's shares were halted from trading by Market Regulation Services Inc. in the afternoon of October 13, 2004 pending the issue of this press release.  The press release, in relevant part, stated:

> The Order, which relates to the time period between January 1, 1996 to  July 30, 2004, requires that certain documents be provided by Scotiabank  to the RCMP in relation to four companies, Royal Building Systems, a  subsidiary of the Company, Royal St. Kitts Beach Resort Limited (the "Resort") and two of the Resort's affiliates. The Resort is  majority-owned by Vic De Zen, the controlling shareholder and  non-executive Chairman of Royal Group. Douglas Dunsmuir, the Chief  Executive Officer of the Company, has a 5% interest in the Resort. The Resort purchased products and services from the Company during the   aforementioned period for an

approximate value of $32 million. The documents requested under the Order relate to these four companies  and include banking documents, documents relating to research and  development grants and related tax credits and the Kroll Report referred to below. In support of the document request, the Order lists five  allegations of actions contrary to the Criminal Code and specifically names Vic De Zen, Douglas Dunsmuir and Gary Brown, a former officer of  the Company. These allegations include an intent to defraud the shareholders and creditors of the Company and to deceive the shareholders and others by circulating or publishing a prospectus or statement or account which they knew was false. These are allegations only. The Company has not been provided with any particulars of these allegations.

The Company requested that the Justice who issued the Order, seal it.  The Company was concerned that it would not be able to issue a public  statement in a full and complete fashion, as there was no clarity in the  Order in terms of the specific allegations, events and transactions  being investigated without disclosure of all of the information in the supporting affidavit. Public disclosure was made concerning the  existence of the Order and as a result, the request was withdrawn today by the Company. The Order is supported by an affidavit sworn by the RCMP. The affidavit was and remains sealed.

The Company and its independent directors are seeking counsel's advice as to methods to access the information underlying the allegations to consider whether they can take further action and in order for the Company and its independent directors to provide full public disclosure. The Company understands that the RCMP has confirmed that search warrants have been issued in connection with their investigation. The Company has  not received a copy of any such search warrants. No search warrants or production orders have been served on the Company.

The Company established a Special Committee comprised of independent members of the Board of Directors in late December 2003 to conduct an independent investigation related to the OSC and RCMP investigations into transactions involving the Company and the Resort. The Company has  never been provided by the OSC or the RCMP with any particulars of allegations relating to these investigations. The Special Committee retained Kroll Linquist Avey ("Kroll") to assist in the independent  investigation. Kroll concluded in its Report, which was issued in April  2004, that there was no evidence of conduct or actions calculated to improperly shift costs to

the Company from the Resort. Kroll had reviewed its work plan with the Ontario Securities Commission prior to commencing its work to ensure that the scope of the work would be appropriate to address the concerns raised by the Commission. A summary of the Kroll Report is contained in the Company's press release dated April 29, 2004. Following the Kroll Report, and based on all of the available information at that time, the Special Committee recommended that no further investigative action be taken at that time. The Company has always and continues to cooperate fully with the RCMP, including its recent gathering of voluminous materials arising from communications with the RCMP and in anticipation of their review. Based on all of the information available to the Company, including discussions with the RCMP, Royal Group continues to understand, as previously announced, that it is not the target of the RCMP's investigation.

Based on the information now available to the independent directors of the Board, particularly the extensive investigation conducted by Kroll, and in the absence of any new or contrary evidence or information, the independent directors of the Board continue to fully support Mr. Dunsmuir's efforts to improve the Company's performance and enhance shareholder value.

As stated in the Company's press release dated April 29, 2004, the Commission had advised the Company that the RCMP's investigation may produce results which are material to the Company, most specifically in relation to its past financial disclosure and certain trading. Accordingly, the Commission retains an investigative interest in the matter.

48.    The news shocked the market.  Shares of Royal Group fell $1.12 per share, or 12.49 percent, on October 18, 2004, to close at $7.85 per share.

**Post-Class Period Disclosures**

49.    On October 18, 2004, Royal Group issued the following press release wherein it stated:

Royal Group Technologies Limited ("Royal Group" or the "Company") (RYG.SV: TSX, RYG: NYSE) announced today that it has received a letter from the RCMP advising that Royal Group is a target of the RCMP's investigation. Prior to receiving the letter from the RCMP, Royal Group understood, based on all of the information

-28-

available to the Company, including discussions with the RCMP, that the Company was not a target of its investigation. Except as disclosed in the Production Order referred to below as detailed in the Company's press release on October 15, 2004, the Company has no information as to the reasons for the RCMP's change in position.

On Friday, October 15, 2004, the Company announced that Staff of the Ontario Securities Commission provided the Company with a copy of a Production Order on October 12, 2004 that was issued on October 5, 2004 by a Justice in Ontario addressed to the Vice President and Chief Security Officer of Scotiabank. The Company's shares were halted from trading by Market Regulation Services Inc. in the afternoon of October 13, 2004 pending the issue of a press release. The shares resumed trading on Monday October 18, 2004. Reference is made to the Company's press release of October 15, 2004 for further particulars with respect to the Production Order.

50.    Then on October 21, 2004, Royal Group issued a press release with the headline:

"Royal Group Technologies Expands Mandate of the Board's Special Committee."  Therein, the

Company stated:

Royal Group Technologies Limited (RYG.SV:TSX, RYG:NYSE) today announced that it has expanded the special committee of its board of directors that was established in December 2003 to conduct an independent investigation related to the Ontario Securities Commission and Royal Canadian Mounted Police investigations into transactions involving the Company and Royal St. Kitts Beach Resort Limited. The Company has also expanded the mandate of the committee.

The expanded special committee comprises all of the independent directors of the Company: Ralph Brehn, Irvine Hollis, Robert Lamoureux, James Sardo and Ronald Slaght. Its expanded mandate will include the following in the context of the investigations and inquiries by the securities regulatory authorities and the RCMP and any similar or related investigations and inquiries that may be commenced by these or other authorities.

- All communication and other dealings with the securities regulatory authorities and law enforcement agencies will be either undertaken by, or co-ordinated through, the special committee.

- All news releases and other communications with the public and the media will be undertaken by, or co-ordinated through, the special committee.

- The special committee will make determinations with respect to the role within the Company of any individuals who are currently involved in, or subsequently become involved in, any regulatory or law enforcement investigations and/or proceedings.

The special committee will continue to be advised by Goodmans LLP, as independent legal counsel, and will receive input and assistance as appropriate from the Company's management and regular advisors.

"The board of directors determined that it was important to expand the committee and its mandate to ensure that these matters are dealt with effectively and independently, and to ensure that management can focus on the operations of the Company," stated James Sardo, the Chair of the special committee. "Based on the information now available to the independent directors, particularly the extensive investigation conducted by Kroll Linquist Avey, and in the absence of any new or contrary evidence or information, the independent directors continue to fully support the efforts of our Chief Executive Officer, Douglas Dunsmuir, to improve the Company's performance and enhance shareholder value."

51.     On October 28, 2004, Royal Group announced the Staff of the Ontario Securities Commission ("OSC") provided the company with a copy of a second Production Order ("the Second Order") addressed to the Vice President and Chief Security Officer of Scotiabank. The Second Order was issued on October 25, 2004 by a Justice in Ontario. Receipt of the first Production Order (the First Order) was disclosed by the company on October 15, 2004.  More specifically, the Company stated:

The Second Order, which relates to the time period between January 1, 1996 to present, requires that certain documents be provided by Scotiabank to the RCMP in relation to certain individuals and a number of entities, including Royal Group and certain related companies. The documents requested relate to bank accounts and other banking information.

-30-

In support of the document request, the Second Order lists six allegations of actions contrary to the Criminal Code. These allegations are similar to the allegations in the First Order but name, in addition to the individuals named in the First Order, Ron Goegan, the current chief financial officer of the company, and Fortunato Bordin and Domenic D'Amico, both of whom are nonexecutive employees of the Royal Group and have been significant shareholders of the company. Based on the Kroll report (referred to below), the company believes that, as of December 31, 2003, Fortunato Bordin and Domenic D'Amico had a 20% and 15% interest in Royal St. Kitts Beach Resort Limited (the Resort), respectively, and Ron Goegan had a 0.0195% interest in the Resort. The Second Order also includes an allegation of stealing money from the company of a value exceeding $5,000. The new allegation names Vic De Zen, Doug Dusmuir, Gary Brown, Fortunato Bordin and Domenic D'Amico but does not name Ron Goegan. The company has not been provided with any particulars of these allegations.

As previously disclosed, the company's board of directors established in late December 2003 a special committee (the Special Committee) comprising independent directors to conduct an independent investigation related to the OSC and RCMP investigations into transactions involving the company and the Resort. The company has never been provided by the OSC or the RCMP with the particulars of allegations relating to these investigations.

The Special Committee retained Kroll Linquist Avey (Kroll) to assist in the independent investigation. Kroll concluded in its report, which was issued in April 2004, that there was no evidence of conduct or actions calculated to improperly shift costs to the company from the Resort.  Kroll had reviewed its work plan with the OSC prior to commencing its work to ensure that the scope of the work would be appropriate to address the concerns raised by the OSC. A summary of the Kroll report is contained in the company's news release dated April 29, 2004. Following the Kroll report, and based on all of the available information at that time, the Special Committee recommended that no further investigative action be taken at that time.

On October 21, 2004, the board expanded the Special Committee to include all five independent directors and widened its mandate. Its expanded mandate includes the following in the context of the investigations and inquiries by the securities regulatory authorities

and the RCMP (and any similar or related investigations and inquiries that may be commenced by these or other authorities).

- All communication and other dealings with the securities regulatory authorities and law enforcement agencies will be either undertaken by, or co-ordinated through, the Special Committee.

- All news releases and other communications with the public and the media will be undertaken by, or co-ordinated through, the Special Committee.

- The Special Committee will make determinations with respect to the role within the company of any individuals who are currently involved in, or subsequently become involved in, any regulatory or law enforcement investigations and/or proceedings.

"Royal Group is continuing to cooperate fully with the RCMP, including its recent gathering of voluminous materials arising from communications with the RCMP and in anticipation of their review," said James Sardo, Chair of the Special Committee. "Effectively, this remains an investigation of unproven allegations."

"Based on the information now available to the independent directors," Mr. Sardo continued, "particularly the extensive investigation conducted by Kroll, and in the absence of any new or contrary evidence or information, the independent directors continue to fully support both Mr. Dunsmuir and Mr. Goegan. We continue to believe that it is important that Royal Group's management team be able to focus on operating the company and growing its revenues and profitability for the benefit of all shareholders. Accordingly, as previously stated, the special committee will be responsible for assisting with all matters related to the ongoing investigations."

As first stated in the company's news release dated April 29, 2004, the
OSC had advised Royal Group that the RCMP's investigation may produce results which are material to the company, most specifically in relation to its past financial disclosure and certain trading. Accordingly, the OSC retains an investigative interest in the matter.

52.    On November 29, 2004, Royal Group announced the following:

Royal Group Technologies Limited (Royal Group or the company) (RYG.SV-TSX, RYG-NYSE) today announced that the Special

Committee of independent directors, acting on the authority previously provided by the Board of Directors, has terminated for cause Douglas Dunsmuir, the company's President and Chief Executive Officer, and Ron Goegan, its Senior Vice-President and Chief Financial Officer.

The Special Committee also dismissed Vic De Zen as Chairman of the Board.  The Special Committee determined that Mr. De Zen, who resigned on December 18, 2003 as the company's co-Chief Executive Officer, Mr. Dunsmuir, and Mr. Goegan are not entitled to receive termination severance. The Special Committee has requested that all three resign as directors of the company.

Robert Lamoureux, who joined Royal Group's Board in November 2003 as an independent director and who has been serving as the Board's lead director, will continue in that capacity. The Board expects to appoint a new Chairman at a future date and is undertaking a search for individuals who will further strengthen its Board as independent directors.

The Board appointed V. James Sardo, an independent director who joined the Board in November 2003, to serve as the company's interim President and Chief Executive Officer and Mr. Lamoureux as interim Chief Financial Officer. Both men have been, and will continue to serve, on the Special Committee. The Board will be considering both internal and external candidates to fill the CEO and CFO positions for the longer-term.

On November 8, 2004, the Special Committee retained Kroll Lindquist Avey (Kroll) to carryout forensic accounting work beyond the scope of the investigation that it completed earlier this year. The earlier work by Kroll, completed at the end of April 2004, concerned transactions between Royal Group and the Royal St. Kitts beach resort development, majority-owned by Mr. De Zen.

In the early stages of its additional forensic work under the new mandate, Kroll identified and brought to the attention of the Special Committee information regarding a related-party land transaction completed in 1998, involving Mr. De Zen, Mr. Dunsmuir, and others, and which Mr. Goegan facilitated. The transaction concerned the purchase in Woodbridge, Ontario of approximately 185 acres of land by a numbered company, owned by Mr. De Zen and certain associates, including Mr. Dunsmuir, for $20.5 million. Immediately after the closing of that purchase the property was sold to Royal

Group for approximately $27 million. The fact that the land purchase was a related-party transaction was not brought to the attention of the Board of Directors in 1998. The Board also was not informed about the profit that the related party would make on the purchase. The purchase was not authorized by the Board.

"At the very least, in the unanimous opinion of the Special Committee," Mr. Sardo said, "the roles played by Mr. Dunsmuir, Mr. Goegan, and Mr. De Zen in these matters showed a breach of their responsibilities to the company causing us to terminate their positions.  "It should be noted," Mr. Sardo continued, "that the related-party land purchase transaction took place more than six years ago and it does not appear to have had a material effect on the company's financial performance in 1998. It has no impact on Royal Group's current financial strength."

The Special Committee also terminated for cause and without severance two other non-executive employees of the company, engaged in its tool and die manufacturing operations, Fortunato Bordin and Domenic D'Amico, as the result of their participation in the related-party land purchase transaction as investors in the numbered company.

Jim Sardo, Royal Group's interim President and CEO, brings to his new role extensive senior management experience in publicly owned companies in Canada and internationally. Mr. Sardo, who was appointed to Royal Group's Board in November 2003, has served as President and/or CEO of six companies in diverse sectors, including building products, consumer products, automotive parts, printing, and retail.

Mr. Sardo's previous senior corporate positions have included: President of the Canadian Operations of Moore Corporation Ltd., Toronto; President and CEO, Amre Inc. (was one of the largest home improvement window and siding companies in the U.S.), Dallas, Texas; President and CEO of SMK Speedy International Inc., Toronto; Chairman, President, and CEO, Firestone Canada Inc., Hamilton, Ontario; President of Bridgestone/Firestone's Firestone Industrial Products Company, Indianapolis, Indiana; and President and CEO of SNE Enterprises, Inc., Wausau, Wisconsin (one of the largest window manufacturers in the United States). He also currently serves as a director or trustee of five publicly owned companies and income funds, and is a former Director and Vice-Chairman of the

-34-

National Wood, Window & Door Association in the U.S. He is also a member of the Institute of Corporate Directors.

Robert Lamoureux, a Chartered Account, joined Royal's board in November 2003. He currently serves as lead director and chair of the audit committee. Mr. Lamoureux retired from PricewaterhouseCoopers in 2003, after nearly 35 years of service. During his career, he was an audit partner for a number of years and during his last three years he was National Leader of PwC's Corporate Governance practice. Mr. Lamoureux also serves on the board of one other Canadian public company. Mr. Lamoureux is a director of the Institute of Corporate Directors and Chair of its Ontario Chapter.

"The changes that we made are necessary and significant," Mr. Sardo continued, "and we believe that the quality of the more than 9,000 people throughout the Royal Group who have helped to make this company one of Canada's leading domestic and international manufacturing success stories, the excellence of our products and manufacturing technologies, and the strong relationships that we have forged with suppliers and customers over the years, will enable the company to continue to prosper. We are taking immediate steps that we believe will result in further improvements to Royal Group's operating efficiencies and financial performance, while ensuring that we meet the needs of our customers, suppliers, and employees."

53.     On January 28, 2005, the RCMP obtained a search warrant in order to obtain additional documents from the Bank of Nova Scotia concerning the criminal investigation into the financial activities of Royal Group and the Individual Defendants.  On February 1, 2005, RCMP investigators raided the headquarters of the Bank of Nova Scotia with a team of 25 people for a multi-day search.

54.     On March 24, 2005, it was announced that the Special Committee recommended an overall settlement with Defendant De Zen whereby: (i) De Zen would personally repay $6.5 million, plus interest of $2.2 million, as a result of the gains he earned through the sale of the Vaughan West Lands to the Company, paid in stock; (ii) De Zen would repay the $1.13 million in bonuses he

received in 2002; (iii) De Zen would sign a non-compete covenant extending to December 18, 2006; (iv) De Zen would release all known claims against the Company; (v) the Company will release all known claims against De Zen; and (vi) De Zen would resign from the Board.  In lieu of the settlement announced on March 24, 2005, De Zen converted each of his Multiple Voting Shares to Subordinate Voting Shares and resigned from the Company's Board during June 2005.

55.     The SEC is also formally investigating the wrongdoing alleged herein, including the Company's past accounting practices and disclosures. As part of these investigations, Royal Group received various requests for information from the SEC, including a subpoena served on or about July 27, 2005.

## CLASS ACTION ALLEGATIONS

56.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of on behalf of themselves and (i) all United States citizens and entities that purchased or otherwise acquired the common stock of Royal Group on the New York Stock Exchange ("NYSE") or the Toronto Stock Exchange ("TSE"); and (ii) all foreign persons and entities that purchased or otherwise acquired the common stock of Royal Group on the NYSE, between February 24, 2000 and October 18, 2004, and who were damaged thereby.

57.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.

58.     Plaintiff's claims are typical of the claims of the members of the Class, because plaintiffs and all of the Class members sustained damages arising out of defendants' wrongful conduct complained of herein.

59.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced and competent in class actions and securities litigation.

60.     A Class Action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

61.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

> (a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;
>
> (b)     Whether Defendants breached their fiduciary duties by engaging in fraudulent activity; and
>
> (c)     Whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## DEFENDANTS VIOLATION OF GAAP RULES
## IN ITS REPORTS FILED WITH THE SEC

62.     These financial statements and the statements about the Company's financial

results were false and misleading, as such financial information was not prepared in conformity

with GAAP, nor was the financial information a fair presentation of the Company's operations

due to the Company's improper accounting for and disclosure about its revenues, in violation of

GAAP and SEC rules.

63.     GAAP are those principles recognized by the accounting profession as the

conventions, rules and procedures necessary to define accepted accounting practice at a

particular time. Regulation S-X (17 C.F.R. '210.4-01(a) (1)) states that financial statements filed

with the SEC which are not prepared in compliance with GAAP are presumed to be misleading

and inaccurate. Regulation S-X requires that interim financial statements must also comply with

GAAP, with the exception that interim financial statements need not include disclosure which

would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R.

'210.10-01(a).

64.     Given these accounting irregularities, the Company announced financial results

that were in violation of GAAP and the following principles:

> (a)     The principle that interim financial reporting should be based upon the
> same accounting principles and practices used to prepare annual financial
> statements  was violated (APB No. 28, &10);
>
> (b)     The principle that financial reporting should provide information that is
> useful to present to potential investors and creditors and other users in making
> rational investment, credit, and similar decisions  was violated (FASB Statement
> of Concepts No. 1, &34);
>
> (c)     The principle that financial reporting should provide information about the
> economic resources of an enterprise, the claims to those resources, and effects of

-38-

transactions, events, and circumstances that change resources and claims to those resources  was violated (FASB Statement of Concepts No. 1, &40);

(d)     The principle that financial reporting should provide information about an enterprises financial performance during a period was violated  (FASB Statement of Concepts No. 1, &42);

(e)     The principle that completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, &79);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent  was violated  (FASB Statement of Concepts No. 2, &&58-59); and

(g)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered  was violated.  (FASB Statement of Concepts No. 2, &95).

64a.    The adverse information concealed by defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. 229.303).

### ROYAL GROUP'S FINANCIAL STATEMENTS DURING THE CLASS PERIOD WERE MATERIALLY FALSE AND MISLEADING

65.     During the Class Period, Royal Group filed financial statements with the SEC which were represented to have been prepared in conformity with generally accepted accounting principles in Canada ("Canadian GAAP"). The SEC requires that each annual financial statement filed on Form 20-F must be reconciled to U.S. generally accepted accounting principles ("U.S. GAAP"). Royal Group's annual financial statements filed with the SEC on Form 20-F during the Class Period were purportedly reconciled to U.S. GAAP.

66.     During the Class Period, Defendants falsely represented that the financial statements Royal Group issued to investors were prepared in accordance with Canadian GAAP

and reconciled to U.S. GAAP and the accounting and disclosure rules and regulations of the SEC.[1]  By failing to file financial statements with the SEC which conformed to Canadian and U.S. GAAP, Defendants repeatedly disseminated financial statements of Royal Group that were presumptively misleading and/or inaccurate.[2]

## UNDISCLOSED ADVERSE INFORMATION

67.     The market for Royal Group's publicly traded securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Royal Group's publicly traded securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Royal Group publicly traded securities relying upon the integrity of the market price of Royal Group's publicly traded securities and market information relating to Royal Group, and have been damaged thereby.

68.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Royal Group's publicly traded securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

---

[1] U.S. generally accepted auditing standard ("GAAS") §AU 411.02 defines U.S. GAAP as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

[2] Pursuant to Regulation S-X (17 C.F.R. §210.4-01(a)(1)), financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

69.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Royal Group's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Royal Group and its business, prospects and operations, thus causing the Company's publicly traded securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's publicly traded securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

70.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Royal Group, their control over, and/or receipt and/or modification of Royal Group's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Royal Group, participated in the fraudulent scheme alleged herein.

-41-

71.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

72.     On or about November 15, 2000, during the Class Period and with the Company's stock trading at artificially inflated prices, Defendant De Zen and other Company founders and executives disposed of 3.15 million Subordinate Voting Shares of Royal Group (with a value of approximately $63 million) pursuant to forward purchase agreements entered into in November 1997.  During April 2002 , Defendant De Zen pocketed approximately $67 million by pledging 3.6 million (or approximately 22.59%) of his Multiple Voting Shares in a private placement debenture transaction with Scotia Capital Inc.  Specifically, De Zen announced on April 18, 2002 in a press release entitled "Closing of Previously Announced Private Placement of Debentures Exchangeable for Shares of Royal Group Technologies Limited," that De Zen, through a holding company controlled by De Zen (3901602 Canada Inc.), closed a private placement of exchangeable debentures and pledged 3.6 million Multiple Voting Shares of Royal Group to secure its obligations upon any exercise of the debenture holders' exchange right.

73.     On April 13, 2000, also during the Class Period and with the Company's stock trading at artificially inflated prices, the Company received the proceeds from distribution in Canada of $150 million principal amount medium term notes.  On July 25, 2000, Royal Group closed a treasury issue of 4,500,000 Subordinate Voting Shares of the company to an underwriting group led

by Scotia Capital Inc.  The purchase price of $35 (Canadian) per Subordinate Voting Share resulted in net proceeds (before expenses of the issue) of approximately $151 million Canadian.

74.    Also, as of September 30, 2003, the Company had $65 million in cash and $326 outstanding on a bank credit facility and defendants desired to convert the balance drawn on the bank credit facility to a term loan payable in April 2005, which the Company effectuated.

### Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine

75.    At all relevant times, the market for Royal Group's publicly traded securities was an efficient market for the following reasons, among others:

> (a)  Royal Group's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;
>
> (b)  As a regulated issuer, Royal Group filed periodic public reports with the SEC and the NYSE;
>
> (c)  Royal Group regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and
>
> (d)  Royal Group was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

76.    As a result of the foregoing, the market for Royal Group's publicly traded securities promptly digested current information regarding Royal Group from all publicly available sources and reflected such information in Royal Group's stock price.  Under these circumstances, all purchasers of Royal Group's publicly traded securities during the Class Period suffered similar

-43-

injury through their purchase of Royal Group's publicly traded securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

77.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Royal Group who knew that those statements were false when made.

## FIRST CLAIM
### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

78.    Plaintiff repeats and reiterates the allegations set forth above as though fully set forth herein.  This claim is asserted against all defendants.

79.    During the Class Period, defendant Royal Group and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: a) deceive the investing public, including plaintiff and other Class members, as alleged herein; b) artificially inflate and maintain the market price of Royal Group's

publicly traded securities; and c) cause plaintiff and other members of the Class to purchase Royal Group's publicly traded securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants Royal Group and the Individual Defendants, and each of them, took the actions set forth herein.

80.     These defendants: a) employed devices, schemes, and artifices to defraud; b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Royal Group's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  These defendants are sued either as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued as controlling persons of Royal Group, as alleged below.

81.     In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

82.     Royal Group and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Royal Group as specified herein.

83.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Royal Group's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Royal Group and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Royal Group's securities during the Class Period.

84.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: a) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; b) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; c) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information

about the Company's financial condition and performance at all relevant times; and d) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

85.     These defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Royal Group's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

86.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Royal Group's securities were artificially inflated during the Class Period.  In ignorance of the fact that market prices of Royal Group's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants

during the Class Period, plaintiff and the other members of the Class acquired Royal Group securities during the Class Period at artificially high prices and were damaged thereby.

87.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Royal Group, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Royal Group publicly traded securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

88.    By virtue of the foregoing, Royal Group and the Individual Defendants have each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

89.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM
### Violation Of Section 20(a) Of The Exchange Act Against
### the Individual Defendants

90.    Plaintiff repeats and reiterates the allegations as set forth above as if set forth fully herein.  This claim is asserted against the Individual Defendants.

91.    Each of the Individual Defendants acted as a controlling person of Royal Group within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual

Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

92.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

93.    As set forth above, Royal Group and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(a)  Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b)  Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 2, 2006                     **BRODSKY & SMITH, LLC**


By:_//Evan J. Smith_ (ES 3254)
Evan J. Smith, Esquire (ES 3254)
240 Mineola Boulevard
Mineola, NY 11501
(516) 741-4977
(516) 741-0626 (facsimile)

**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz, Esquire
Richard A. Maniskas, Esquire
Tamara Skvirsky, Esquire
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (facsimile)

**Attorneys for Plaintiff**